The City of Evansville *et al. v.* The State, *ex rel.* Blend *et al.*

No. 14,841.

## THE CITY OF EVANSVILLE ET AL. *v.* THE STATE, EX REL. BLEND ET AL.

CONSTITUTIONAL LAW.—*Metropolitan Police and Fire Department.—Act of March 7th, 1889.—Amendatory Act.*—The act of March 7th, 1889 (Acts of 1889, p. 222), providing for a board of metropolitan police and fire department in cities of twenty-nine thousand inhabitants, is not an amendatory act, but a new and independent one, and is, therefore, not in violation of section 21, article 4 of the Constitution, which provides that. no act shall be revised or amended by reference to its title, but that the act revised or section amended shall be set forth in full.

SAME.—*Subject of Act.—Constitutional Requirement.*—The purpose of the Legislature in the passage of the act mentioned being to consolidate the police and fire departments under one management, the act, as it only embraces matters relating to that subject, does not violate section 19, article 4 of the Constitution, which requires that every act shall embrace but one subject and matters properly connected therewith.

SAME.—*General Law.—Uniform Operation.—Question for Legislature.*—It is for the Legislature and not for the courts to determine whether an act is in violation of section 23, article 4 of the Constitution, which provides that where a general law can be passed it shall be general and operate uniformly throughout the State.

SAME.—*Authentication of Act.—Passage Over Veto.*—Where an act is passed by both branches of the General Assembly, duly signed by the presiding officers and presented to the Governor, who vetoes it, after which it is reconsidered and passed by both houses, over the Governor's objections, in accordance with the constitutional requirements (section 14, article 5), it thereby becomes a law, without being again signed by the presiding officers or presented to the Governor to be by him filed in the office of the secretary of state.

SAME.—*Special Privileges and Immunities.—Right to Hold Office.—Residence and Political Tests.*—The act of March 7th, 1889, *supra*, in so far as it provides that the members of the boards thereby created shall be elected from opposite political parties and shall have resided in the cities affected for five years preceding their election, and that the members of the police and fire forces to be organized by them shall be chosen equally from the two leading political parties in such cities, is in violation of section 23, article 1 of the Constitution, which prohibits the Legislature from granting to any citizen or class of citizens special privileges or immunities.

The City of Evansville *et al. v.* The State, *ex rel.* Blend *et al.*

SAME.—*Cities and Towns.—Local Self-Government.—Legislature may not Take Away.*—The right of the inhabitants of cities and towns to control their local affairs can not be taken away by the Legislature, and the act of March 7th, 1889, placing the police and fire departments of certain cities, and the property connected therewith, together with the purchase of all supplies, etc., under the exclusive control of commissioners to be elected by the Legislature, is void, as being a denial of the right of local self-government.

SAME.—*Appointment to Office.— Vacancy.—Power of Legislature.*—The Legislature of this State has no power to fill a vacancy occurring in an office, whether of its own creation or otherwise, unless express provision therefor can be found in the Constitution.

SAME.—*Appointment an Executive Function.*—The power to appoint to office is an executive function, and while the Legislature may provide by law for the appointment of all officers not provided for in the Constitution, the appointing power must be lodged somewhere within the executive department of the government.

SAME.—*Local Officers.—Legislature may not Appoint.*—By force of section 18, article 5, and section 1, article 15 of the Constitution, the power to appoint certain officers of the State is reserved to the Legislature, but that department has no authority to appoint local officers, whether county, township, city or town, and the act of March 7th, 1889, assuming to confer upon it authority to appoint police and fire commissioners for cities, is void.

MITCHELL, J., dissents.

From the Vanderburgh Circuit Court.

*D. B. Kumler, H. A. Mattison, A. Gilchrist* and *C. A. De-Bruler,* for appellants.

*J. S. Buchanan, C. Buchanan* and *P. W. Frey,* for appellees.

BERKSHIRE, J.—The complaint filed by the appellees alleges that the Legislature of the State of Indiana passed an act which became a law on the 7th day of March, 1889, pursuant to which the relators were elected and duly qualified as members of the metropolitan police and fire board for the city of Evansville, with full power and control over the police and fire departments, and police department of said city, and full control over the property and records of said city belonging to the said departments.

It is alleged that the appellants refuse to recognize the

authority of the relators, and refuse to turn over said property and records to them, and the prayer is for a writ of mandate to compel the appellants to recognize the authority of the appellees, relators, and requiring them to turn over the property of the city, together with the records belonging to the police and fire departments of the city.

An alternate writ is sued, to which two *returns* were made. The city of Evansville, John H. Dannettell, mayor of said city, Henry S. Bennett, John B. Uphaus, Thomas J. Groves, John Ingle, Henry Stockfleth, William Koelling, George Koch, William Heyns, Albert C. Rosencranz, Frederick J. Scholz, William W. Ross and Albert Johann, members of the common council, made one return, Alexander H. Foster, Edward E. Law and Adolph Goeke, members of the metropolitan police board, and George W. Newitt, the superintendent of the police department, made the other.

The court sustained demurrers to the returns, and a peremptory writ was ordered for want of a sufficient return.

It is disclosed in the record that the city of Evansville received its charter from the Legislature on the 27th day of January, 1847, and that by the charter the common council was given the control and management of the finances and of all the property of the city, and was authorized to purchase fire engines and fire apparatus, to organize fire companies, and to regulate and govern them ; and that, under and by virtue of its charter, the said city has established a fire department, and the common council has managed the same for forty years, and acquired property for the use of said fire department to the value of $100,000.

The record presents the following questions for consideration, all of which relate to the validity of the act of March 7th, 1889, and upon the determination of which the rights of the parties depend :

1. Is the act in violation of section 21, article 4 of the Constitution, which provides that no act shall be revised or

amended by reference to its title, but that the act revised and section amended shall be set forth in full?

2. Is the act in violation of section 19, article 4, which requires that every act shall embrace but one subject and matters properly connected therewith?

3. Is the act in violation of section 23, article 4, which provides that when a general law can be passed it shall be general, and operate uniformly throughout the State?

4. Are the commissioners composing the metropolitan police and fire board officers who require commissions from the Governor to authorize them to qualify and enter upon the duties of their offices?

5. Is the act properly authenticated, or, rather, is there competent evidence of its having received such legislative sanction, after having received the Governor's disapproval, as to make it a law, if otherwise constitutional?

6. Is the act in violation of section 23, article 1 of the Constitution, which provides that the General Assembly shall not grant privileges or immunities to any citizen or class of citizens which upon the same terms shall not belong to all citizens?

7. Is the act in violation of the Constitution, in that it deprives the people of the city of Evansville of the right of local self-government?

8. Is the act in violation of the Constitution, in so far as it gives to the Legislature the power to appoint the commissioners composing the metropolitan board, and conferring upon the board the power to appoint inferior officers and employ policemen, firemen, etc.?

Since the appeal was taken it has been dismissed as to the city of Evansville, but this makes no difference in the consideration and determination of the case.

The title of the act is as follows: "An act providing for a board of metropolitan police and fire department in all cities of this State of twenty-nine thousand or more inhabitants according to the United States census of eighteen hun-

dred and eighty, prescribing how the first members of said boards shall be elected and commissioned, and how their successors shall be appointed. Providing for the organization of the board, defining the duties of the commissioners composing the board, and of the boards; providing for the appointment of superintendent, officers, patrolmen, and other members of the police force, and for the appointment of a chief fire engineer, officers, firemen, and other employees of the fire department of such cities, and the manner of paying them for their services, giving said board full authority over the fire department of said cities, and authorizing the board to purchase all supplies, engines, ladders, wagons, horses and all equipments for said fire department, and prescribing how the bills for the same shall be audited, certified and paid; providing for the abolition of existing boards of police and fire department in such cities, and of the office of city marshal in such cities, and providing for other matters connected with the government of the police and fire department of such cities, repealing all laws in conflict with this act, especially an act providing for a metropolitan police in all cities of twenty-nine thousand inhabitants, etc., Acts 1883, p. 89, and declaring an emergency." Acts of 1889, p. 222.

Section 1 of this act provides that in all cities of this State where the population equalled twenty-nine thousand, according to the census of 1880 as taken by the United States government, there shall be established a metropolitan board of police and fire department, to consist of three commissioners; the members of the first board to be elected by the General Assembly, one of whom shall be of opposite politics to the other two; the secretary of the Senate and speaker of the House of Representatives to furnish a certificate of election to each commissioner, which is to be his authority to act as a member of the board. The said commissioners must have been residents of their respective cities for five years preceding their election.

Section 2 gives the board power to elect a secretary and

property clerk, and requires him to give bond in such an amount and with such sureties as the board may see proper to require, and he shall receive such compensation as the board may fix, not to exceed $1,500 per annum, and hold his office at the pleasure of the board.

Section 3 provides that the board shall have power to select a superintendent of police, captains, sergeants, detectives and such other officers and patrolmen as the board may deem advisable. These are to be selected equally between the two leading political parties of said city. These persons are to receive such compensation as the board shall determine, the superintendent not less than $1,000 nor more than $2,000; a captain not less than $700 nor more than $1,200; a sergeant not less than $600 nor more than $1,000; a patrolman not less than $550 nor more than $800 per annum. The compensation for all other officers and employees shall be fixed and determined by the board, not to exceed $1,000 per annum. The board is empowered to remove or suspend all officers and persons employed on either force, at any time.

Section 4 gives full control of both departments to the board and the custody and control of all property, including station-houses, city prisons, patrol wagons, books, records and equipments belonging to the police department, and all engine-houses, engines, ladders, hose-reels, horses, wagons, books, records and all equipments and property of every description belonging to the fire department.

Section 5 provides that the board shall, immediately after its organization, assume and exercise the entire control of the fire department, and employ a chief engineer at a salary not to exceed $2,000 per annum, appoint firemen and all necessary employees of the fire department and fix their compensation, and that they shall be selected equally between the two leading political parties of the city.

Section 6 provides that it shall be the duty of the board of aldermen and the board of common council, when there are the two, and when but one, the duty of the common council,

to provide, at the expense of the city, all necessary accommodations within the city limits for station-houses, hook and ladder-houses, to furnish the same, to warm and light the same by day and by night, and to provide food for persons in the station-house, to provide at the expense of the city for the expense of the fire department incurred in the purchase of engines, ladders, hose, horses, or other necessary equipments ordered by said board, and for all expense incurred by said board in administering the fire department of said city ; also, for such office expenditures, records, books, stationery, printing, furniture, and for the preservation, repair and cleaning of all buildings belonging to or in any way connected with the police and fire departments of the city.

It is then expressly provided that it is the intention and meaning of the act that all necessary expense of executing the duties imposed on the board, and maintaining the two departments, and which the board alone is authorized to incur, shall be a charge upon the city.

All expenditures are to be audited by the board, certified to as correct by its president and secretary, and at the close of each month deposited with the city clerk, who shall lay the same before the boards of aldermen and council, if there be two, or if but one, then before the common council, at the first meeting in each month, and said legislative bodies or body of such city shall make monthly appropriations for the payment of all such expenditures.

Section 8 we do not care to refer to. Section 9 abolishes the office of marshal, and confers all duties usually performed by him upon the police force.

Section 10 we do not care to refer to. Section 11 makes it a misdemeanor for any persons, corporation, common council, or other municipal, township, county or State officer or officers, to interfere in any way with the metropolitan board of police and fire department in the performance of its duties as defined in the act, subject to a fine of not less than $100 nor more than $1,000.

Section 12 confers on the board authority to swear in any number of patrolmen to do duty at any place within the city, upon the application of any person or persons, at the expense of such person or persons. The other sections need not be referred to.

We are not of the opinion that the act of March 7th, 1889, is in violation of section 21, article 4 of the Constitution. It is not an amendatory act, but a new and independent act.

It is not our opinion that the act is in violation of section 19, article 4. The evident purpose of the Legislature was to consolidate the police and fire departments, in the cities embraced within the act, under one management, and the act only embraces matters relating to that subject.

To the objection that the act is in violation of section 23, article 4, the answer must be that the question is one for the Legislature, and not for the courts. *Wiley* v. *Corporation of Bluffton,* 111 Ind. 152.

It is not necessary for us to pass upon the question as to whether the commissioners composing the metropolitan board, as provided for in the act, are such officers as should be commissioned by the Governor, and we therefore leave the question open for future consideration.

In our opinion the objection that the act in question is not a valid and binding law, because not properly authenticated, is not a valid objection.

The act passed both branches of the General Assembly, was duly signed by the two presiding officers, and presented to the Governor. He returned it without his signature, and with objections, to the House of Representatives, the house wherein it originated; his objections were entered at large on the journals, and the bill reconsidered and passed by a majority of all the members elected to that house; it was then sent to the Senate, with the Governor's objections, reconsidered, and approved by a majority of all the members

elected to that house. The moment it passed the Senate it became a law.

Thus reads the Constitution, article 5, section 14: "Every bill which shall have passed the General Assembly shall be presented to the Governor; if he approve, he shall sign it, but if not, he shall return it, with his objections, to the house in which it shall have originated, which house shall enter the objections, at large, upon its journals, and proceed to reconsider the bill. If, after such reconsideration, a majority of all the members elected to that house shall agree to pass the bill, it shall be sent, with the Governor's objections, to the other house, by which it shall likewise be reconsidered; and if approved by a majority of all the members elected to that house, *it shall be a law.*"

The Constitution does not require that it again be signed by the presiding officers of the two houses, transmitted to the Governor and by him filed in the office of the secretary of state. The reconsideration of a bill which has received the Governor's condemnation, by either branch of the General Assembly, is for such branch to further consider and act upon it, and when this is done and the bill has passed both houses by the required majority, the constitutional provision has been complied with. The evidence as to the passage of the bill is to be found in the journals of the two houses. *Evans* v. *Browne,* 30 Ind. 514, *Bender* v. *State,* 53 Ind. 254, and *Board, etc.,* v. *Burford,* 93 Ind. 383, are not in opposition to the conclusion as here stated. Those cases rest upon section 25 of article 4 of the Constitution, which reads as follows: "A majority of all the members elected to each house shall be necessary to pass every bill or joint resolution; and all bills and joint resolutions so passed shall be signed by the presiding officers of the respective houses."

The one constitutional provision requires that the bill be signed by the presiding officers of the two houses, and the other that it shall become a law when it has been reconsid-

-ered and has passed the two houses by the required majorities.

The act under consideration classifies the citizens of Indianapolis and Evansville as to eligibility for commissoners of the metropolitan board : (1) Those who have resided in those cities for five years, and (2) those who have not. Those of the first class are eligible to be elected commissioners, and those who belong to the second class are ineligible. To the first class privileges and immunities are granted, which, upon the same terms, do not equally belong to the second class.

It is no answer to say that when those who belong to the second, or disqualified class, have resided in the city for the required length of time the disqualification is removed and they become eligible, for the reason that the five years' residence transfers them to the eligible class.

The act classifies the citizens of the two cities to which it applies, as to the positions and employments on the police force and in the fire department, by requiring that all officers and employees be selected from the two leading political parties found in these cities.

It is well known that members of probably a half-dozen political parties reside in these cities, and that a large number of citizens who belong to no particular party reside therein. All of these persons are disqualified for positions and employment in either of the departments named.

If it is competent for the Legislature to require, as a test for position or employment under the provisions of the act under consideration, membership in a political party or organization, it is difficult to understand why a religious or any other test may not be made.

We are of the opinion that in so far as the act creates a residence qualification or prescribes a political test, it contravenes the Constitution. It is not only in violation of the spirit, but of the letter of section 23, article 1. Upon a question so clear it would hardly seem necessary to cite authorities, but see Cooley Const. Lim. (5th ed.) 483 ; *Brown*

v. *Haywood,* 4 Heisk. 357; *Louthan* v. *Commonwealth,* 79 Va. 196 (52 Am. Rep. 626); *Attorney General* v. *Board, etc.,* 55 Am. Rep. 675.

The city of Evansville has been under a charter granted by the Legislature in 1847, and until the passage of the act in question, and the appointment of the relators as commissioners, there has been no legislative interference with the fire department.

The metropolitan board which said act creates is given supreme control of both the police and fire departments of said city. It employs and controls the superintendents, officers, patrolmen, etc., of the police department, the chief engineer, officers, firemen, etc., of the fire department, determines the amount to be paid and manner of payment for services rendered in each of these departments, subject to certain limitations as to amounts, and is given exclusive authority to purchase wagons, hose, and all equipments for the fire department, and to determine the manner in which the bills shall be audited, certified and paid.

All property belonging to the said city for the use of each of these departments, by this legislative act is taken from the city, its officers and representatives, and turned over to the metropolitan board, which, so far as the fire department alone is concerned, is of the value of $100,000; and said city is required to turn over all of its records relating to these two departments. The commissioners who compose the board are not the officers or representatives of the city, for it has no part in their selection, and no control over their action; they are appointed by the Legislature, and derive all authority from that high power. They are, therefore, the officers and representatives of the State, and not of the city. But, under the law, all expenses, of whatever kind, relating to these departments, the city has to pay. The commissioners audit the expenses of their management, and the president and secretary of the board certify the same monthly, and the city council, at its first meeting thereafter, is required to make

appropriations to pay the same, without question as to the justness or correctness thereof. If the act related alone to the management of the police department, and the State was proposing to take upon itself the burden of maintaining the department, as well as its management, or if it were made to appear that the city had failed to furnish a police force, or one that was sufficient for the protection of persons and property, then a very different question would be presented for our consideration.

Except so far as an efficient police department goes, which is for the protection of the public at large, the people of the State are not interested in any of the matters to which the said act of the Legislature relates, but the citizens of Evansville and Indianapolis, the two cities to which the act applies, are alone interested. It, therefore, becomes a question whether or not the Legislature may take from the people of these two cities the right of local self-government, the right to manage and control their own purely local affairs in their own way, and place the management of all such local affairs under State control. We do not believe that the Legislature has any such power. Before written Constitutions, the people possessed the power of local self-government.

It is conceded that the people of Indiana originally possessed all governmental power, and it will not be questioned but that they still possess such of that power as has not been delegated. All the power which the people have delegated is what has passed from them by the Constitution. Pomeroy Const. Law (9th ed.), see title, " Centralization and Local Self-Government," sec. 151, *et seq. ;* 1 Dillon Munic. Cor. (3d ed.), section 9 ; Cooley Const. Lim. (5th ed.) 225 ; *People* v. *Hurlbut,* 24 Mich. 44 ; *People* v. *Detroit Common Council,* 28 Mich. 228 ; *People* v. *Mayor,* 51 Ill. 17 ; *People* v. *Lynch,* 51 Cal. 15 ; *People* v. *Albertson,* 55 N. Y. 50 ; *People* v. *Porter,* 90 N. Y. 68.

The statute in question is a very remarkable statute, to say the least of it, and, if it became necessary, it would be a ques-

tion for serious consideration whether it ought not to be held unconstitutional upon the ground that it is contrary to natural justice and equity.  See *Pumpelly* v. *Village of Owego,* 45 How. Pr. R. 219, 246; *Bradshaw* v. *Rodgers,* 20 Johns. 103.  Many other cases might be cited.  We quote the following from *Atkins* v. *Town of Randolph,* 31 Vt. 226 : " This view seems to be fully recognized and embodied in the learned and elaborate opinion drawn up by ISHAM, J., in the case of *Montpelier* v. *East Montpelier,* 29 Vt. 12.   That case, more-over, as well as *Bowdoinham* v. *Richmond,* 6 Greenl. 112, demonstrates that some things are beyond the scope of legitimate legislation, as affecting municipal corporations, a doctrine entirely at variance with the idea of the illimitable supremacy of the law-making power over such corporations.  The language of HUTCHINSON, J., in *Poultney* v. *Wells,* 1 Aik. 180, embodying the principle upon which the decision of that case was rested, is comprehensive, and to the point.  He says, ' the court are unanimous in the opinion that the school right, thus appropriated by the charter, belongs to the town of Wells, *so that the Legislature can exercise no power over it to vary its appropriation, without the consent of the town,* and this consent must be by those who are inhabitants of the town at the time the assent is given.'  See, also, *Moodaley* v. *Morton,* 1 Br. Ch. 469; * * *Fourth School District* v. *Wood,* 13 Mass. 192 ; 2 Kent Com. 275; Ang. & Ames Corp. secs. 23, 24, 33; *Louisville* v. *University,* 15 B. Mon. 642. These cases, and many more that might be cited, fully indicate the double character which such corporations bear, and the rights which they have, and the relations which they sustain by virtue of each character respectively.   They are expressions and illustrations of the reason why, from the fact of towns existing in organized corporations, *primarily* for certain public political purposes, as auxiliary to the practical government of the State, and as such, are under the absolute control of the Legislature, it does not follow that they, as organized corporations, or the inhabitants composing them, can be subjected, arbitrarily, to

pecuniary burdens and liabilities, to be responded to either by the property of the town or of its inhabitants. In this case, the practical thing sought to be done under the law in question, is, that the town, nominally as a corporation, but in fact, the inhabitants of the town subject to taxation, may be compelled to appropriate so much of their property, proportionately, as shall be sufficient to pay for the liquors purchased by Mann, in his character of agent, whatever may be the amount. If through the artificial contrivance of municipal corporations, of which the inhabitants of the State must be members, *nolentes volentes,* such consequences can be wrought out, most persons would invoke the exercise of the annihilating power of the government over such corporations, rather than of the power of the police regulation, in virtue of which alone, this provision of the law is sought to be sustained."

The liquor, the price and liability for which were involved in the foregoing case, was sold to one claiming to be an agent of the town, receiving his authority from a commissioner appointed for the county in which the town was situated, pursuant to an act of the Legislature of Vermont, the object of the act being to regulate and restrict the sale of intoxicating liquor, which it was claimed was a police regulation. The language and reasoning in the case are very much in point in the case under consideration. See 1 Dillon Munic. Corp., p. 97, section 73.

The Constitution very fully recognizes local self-government.

Section 6, article 6, makes provision as to where county, township and town officers shall reside.

Section 8, same article, gives to the General Assembly power to provide by law for the impeachment of those officers.

Section 10, same article, provides and gives to the Legislature the power of conferring upon county boards powers of a local administrative character.

Section 3, article 9, grants to county boards the power to provide county asylums.

Section 14, article 7, provides for the election of justices of the peace in the several townships.

In clause 4 of the schedule, municipal corporations are continued in force until modified or repealed.

No provision is found anywhere in the Constitution which takes from the people the right of local self-government.

The last question which we desire to consider is as to the power of the Legislature to create an office and appoint the incumbent.

Article 3, section 1, of the Constitution, divides the governmental powers into three departments, to wit: the legislative, executive and judicial; and it is expressly further provided that no person who is charged with official duties under one of these departments, shall exercise any of the functions of the other, except as in this Constitution expressly provided.

It is contended by the appellees that the legislative department is closer to the people than are the other departments, and therefore its powers are more extended than are the powers granted to the other departments. This position can not be successfully maintained.

As all governmental power originally rested with the people, it must necessarily still be lodged with them, except so far as they have delegated it in the Constitution. This being true, whatever power has in the Constitution been delegated to the Legislature, it possesses; so with the executive, and so with the judicial departments. No general grant of power other than that which is legislative can be found in the Constitution. In the exercise of that power it is supreme, except where the Constitution has placed restrictions upon it.

All departments of the State government, but each in its respective domain, represent the people, and, except where otherwise provided in the Constitution, the incumbents are

elected from the people, by the people, and are responsible to the people.   Neither department can encroach upon the jurisdiction and functions of the other, unless authority therefor is found in the Constitution.   *Wright* v. *Defrees,* 8 Ind. 298 ; *Waldo* v. *Wallace,* 12 Ind. 569 ; *Trustees, etc.,* v. *Ellis,* 38 Ind. 3 ; *Columbus, etc., R. W. Co.* v. *Board, etc.,* 65 Ind. 427 ; *Butler* v. *State,* 97 Ind. 373 ; *Lafayette, etc., R. R. Co.* v. *Geiger,* 34 Ind. 185.

What we here decide is not in conflict with *McComas* v. *Krug,* 81 Ind. 327, *Hedderich* v. *State,* 101 Ind. 564, and other cases of like import.   What these cases decide is, as we have stated above, that the Legislature is supreme in the exercise of legislative power, except as limited by the Constitution, and so with the other departments.   *Lafayette, etc., R. R. Co.* v. *Geiger, supra.*

This leads to the inquiry, what is legislative power ? and upon that subject there is an abundance of authority.

The word "legislative" is defined by Worcester as follows : " That makes or enacts laws ; law making.  ' Legislative power.'   Of, or pertaining to, legislation or to a Legislature, as, ' Legislative proceedings.' "   " Legislative " is defined by Zell as follows : " Making, giving, or enacting laws.   Relating or pertaining to the passing of laws."   Webster defines " legislative " as follows : " Giving or enacting laws ; as, a legislative body.   Pertaining to the enacting of laws ; suitable to laws ; as, the legislative style.   Done by enacting ; as, a legislative act." Wharton, in his lexicon, defines " legislation " as follows : " The act of giving or enacting laws."   " Legislature : the power to make laws."   Abbott, in his law dictionary, under the head of " legislate," has the following : " To make laws. * * Legislature : the body of persons in the State clothed with authority to make laws. * * Legislative power : that one of the three great departments into which the powers of government are distributed—legislative, executive and judicial— which is concerned with enacting or establishing, and incidentally with repealing, laws."

We find the following in *Sinking-Fund Cases*, 99 U. S. 700, 761, speaking of the judicial and legislative departments: "The one determines what the law is, and what the rights of parties are with reference to transactions already had; the other prescribes what the law shall be in future cases arising under it." Legislative power is the power to enact, amend or repeal laws. *Lafayette, etc., R. R. Co.* v. *Geiger, supra;* Cooley Const. Lim. 90; *Hawkins* v. *Governor*, 1 Ark. 570; *Wayman* v. *Southard*, 10 Wheat. 1, 46; *Greenough* v. *Greenough*, 11 Pa. St. 489.

When we come to examine article 4 of the Constitution, we find that the powers and restrictions put upon the legislative department are more specifically and definitely prescribed than are those of either of the other departments.

Article 4 is composed of many sections, but they all relate to the exercise of legislative power and matters incidentally connected therewith. Section 16 of that article reads: "Each house shall have all powers necessary for a branch of the legislative department of a free and independent State."

We quote the following from a very able opinion by Chief Justice Thompson, in *Page* v. *Allen*, 58 Pa. St. 338 (98 Am. Dec. 272) : "The expression of one thing in the Constitution, is necessarily the exclusion of things not expressed. This I regard as especially true of constitutional provisions, declaratory in their nature. The remark of Lord Bacon, 'that, as exceptions strengthen the force of a general law, so enumeration weakens, as to things enumerated,' expresses a principle of common law applicable to the Constitution, which is always to be understood in its plain, untechnical sense. *Commonwealth* v. *Clark*, 7 W. & S. 127."

If article 3, section 1, had never been placed in the Constitution, the rule of construction as stated by Judge Thompson and Lord Bacon, applied to section 16 of article 4, *supra*, would exclude the Legislature from exercising any other than legislative power. But the framers of the Constitu-

tion were not satisfied, after the experience that the people had had under the old Constitution, to rely upon the well known rules of legal construction, and, therefore, section 1, article 3, was placed in the Constitution, expressly confining each department to its own jurisdiction and functions, except so far as expressly provided otherwise.

The power to appoint to office is not a legislative function, but belongs to the executive department of the government. *Lafayette, etc., R. R. Co.* v. *Geiger, supra;* Cooley Const. Lim., *supra; Hawkins* v. *Governor, supra; Wayman* v. *Southard, supra; Greenough* v. *Greenough, supra;* Broom Const. Law, 524.

The conclusion must necessarily follow, that the Legislature of this State has no power to fill a vacancy occurring in an office, whether of its own creation or otherwise, except express provision therefor can be found in the Constitution.

The word "expressly," being the word that is employed in the constitutional provision, section 1, article 3, Worcester defines as follows: "In direct terms; plainly." He defines the word "express" as follows: "Given in direct terms; not implied; not dubious; clear; definite; explicit; plain; manifest." The word "expressly" is defined by Zell as follows: "Not by implication; plainly; distinctly." The word "express" he defines as follows: "To set forth in words; * * clear, plain, direct; not ambiguous."

Webster's definition of "expressly" is: "In an express, direct, or pointed manner; in direct terms; plainly." His definition of the word "express" is: "Directly stated; not implied or left to inference; distinctly and pointedly given; made unambiguous by special intention; clear, plain."

In looking over the Constitution it is evident that the framers of the same believed that some such power had been lodged with the Legislature.

Section 18, article 5, provides that when, during the recess of the Legislature, a vacancy shall happen in any office, the appointment to which is vested in the General Assembly, etc.

Section 30, article 4, provides that no senator or representative shall, during the term for which he may have been elected, be elected to any office, the election to which is vested in the General Assembly.

Section 13, article 2, provides that all elections by the people shall be by ballot, and by the Legislature, *viva voce.*

Section 10, article 4, confers on each house the right to choose its own officers, but this is not an election by the General Assembly, such as is referred to in articles 2, 4 and 5.

Article 5, section 5, gives to the Legislature the power of electing a Governor or Lieutenant-Governor when there is a tie, but this is not an election such as is referred to in section 18 of the same article, for no vacancy can occur during a recess of the General Assembly; nor is it such an election as is referred to in article 4, because the choice must be made from the two highest candidates voted for by the people. The election of a United States senator is not the election referred to in article 4, for a member of the Legislature has never been regarded as ineligible to that office. Whatever power the Legislature may have to elect or appoint to office must relate exclusively to State offices. No other construction can be given to section 18 of article 5. It reads: " When, during a recess of the General Assembly, a vacancy shall happen in any office, the appointment to which is vested in the General Assembly; or when, at any time, a vacancy shall have occurred in any *other* State office," etc.

After providing for the election of certain county officers, section 3, article 6, goes on to provide that other county and township officers shall be elected or appointed in such manner as may be prescribed by law.

Section 9, same article, provides that vacancies in county and township offices shall be filled as may be prescribed by law.

Taking these different sections together, it is evident that it was not the intention of the framers of the Constitution to confer upon the Legislature the power to elect or appoint

county or township officers, and the Legislature has never claimed or exercised this power.

The only other section of the Constitution relating to the subject under discussion is section 1, article 15. That section reads as follows : " All officers whose appointments are not otherwise provided for in this Constitution shall be chosen in such manner as *now is*, or hereafter may be, prescribed by law."

The Constitution went into force on the 1st day of November, 1851. At that time there were certain officers who were appointed by the General Assembly, all of whom were State officers, as distinguished from local officers, such as county, township, town and city officers.

Counsel for the appellants contend that the adoption of the Constitution wiped out all such officers, except as saved by the 9th clause of the schedule. This contention is in the face of the 4th clause of the schedule, which is as follows : "And all laws now in force, and not inconsistent with this Constitution, shall remain in force until they shall expire or be repealed ;" and, in addition, the constitutional provision which we are now considering expressly continued the mode of appointment until a different mode should be prescribed by law.

The words " now is," as contained in the said section, continued with the legislative department the power to appoint such officers as it had the right to appoint on the 1st day of November, 1851.

The words " or hereafter may be prescribed by law," which we find in the constitutional provision, confer upon the General Assembly the power to prescribe the mode of appointment. Prescribing the mode of appointment is one thing, making the appointment is another. One is the exercise of legislative power, the other the exercise of an executive function.

As the Legislature is limited to the exercise of legislative power, except when otherwise expressly provided, its power

ceases when it prescribes the mode of appointment to office, except in cases where express power is given to make appointments. We quote from *Jones* v. *Perry,* 10 Yerger, 59 (30 Am. Dec. 430, see p. 436): "The fact that the Constitution may prescribe that the mode of appointing the judges shall be by the Legislature does not constitute the Legislature the constituent." See *State* v. *Kennon,* 7 Ohio St. 546 (560). The Constitution confers upon the Legislature power to organize courts and provide for their jurisdiction, but it can not exercise judicial power. The officers which the Legislature is given the power to appoint are a class of State officers. No other construction can be given to section 18, article 5 of the Constitution, which reads: "When, during a recess of the General Assembly, a vacancy shall happen in any office, the appointment to which is vested in the General Assembly; or when, at any time, a vacancy shall have occurred in any other State office, or in the office of judge of any court, the Governor shall fill such vacancy by appointment, which shall expire when a successor shall have been elected and qualified."

The antecedent to which the words "any other State office" relate is an office "the appointment to which is vested in the General Assembly." Whatever of the offices now in existence, which were in existence when the Constitution was adopted, to which the Legislature appointed the incumbents, section 1, article 15, *supra,* continued the appointing power in the Legislature, and so with the other governmental departments, except so far as has otherwise been provided by law. The Legislature may provide by law for the appointment of all officers not provided for in the Constitution, but the appointing power must be lodged somewhere within the executive department of the government. The only offices now in existence that existed when the Constitution was adopted, to which the General Assembly exercised the power of appointing the incumbents, are, so far as we have been able to ascertain, the State librarian, warden of the State's prison

at Jeffersonville—State Prison South—and the trustees of the insane asylum. There may be others; if so, I have overlooked them. (R. S. 1843, p. 101; Local Laws, 1845, p. 35; Acts of 1847, p. 99; Acts of 1848, p. 83.) The trustees of the blind asylum and of the deaf and dumb asylum were appointed by the Governor. (Acts of 1845, p. 56; Acts of 1846, p. 19; Acts of 1847, p. 41.) Practical construction is of very little consequence when it is exercised in violation of the plain provisions of the Constitution.

We are not of the opinion that the Legislature has any power to appoint local officers, county, township, city or town. We have not overlooked the case of *Collins* v. *State, ex rel.,* 8 Ind. 344. The question now under consideration was not raised or discussed in that case. The question considered and decided was as to the right of the Governor, under the circumstances, to make the appointment, no vacancy having occurred during a recess of the General Assembly. The case of *State, ex rel.,* v. *Harrison,* 113 Ind. 434, is not in conflict with our conclusion. We cite the following additional authorities bearing upon the question of legislative power. We quote : " Under our form of government the Legislature is not supreme. It is only one of the organs of that absolute sovereignty which resides in the whole body of the people. Like other departments of the government, it can only exercise such powers as have been delegated to it; and when it steps beyond that boundary, its acts, like those of the most humble magistrate in the State who transcends his jurisdiction, are utterly void." *Taylor* v. *Porter,* 4 Hill, 140 (40 Am. Dec., at p. 277). *Pumpelly* v. *Village of Owego,* 45 How. Pr. R. 219, 247; *Campbell's Case,* 2 Bland Ch. 209 (20 Am. Dec., see p. 373).

A law may be within the inhibitions of the Constitution as well by implication as by expression. *Page* v. *Allen,* 58 Pa. St. 338 (98 Am. Dec. 272). And when it is, it is the duty of the courts to so declare. *Page* v. *Allen, supra; People* v. *Gillson,* 109 N. Y. 389 (4 Am. St. Rep. 465); *Flint*

The City of Evansville *et al. v.* The State, *ex rel.* Blend *et al.*

*River Steamboat Co.* v. *Foster,* 5 Geo. 194 (48 Am. Dec. 228) ; *Bailey* v. *Philadelphia, etc., R. R. Co.,* 4 Har. 389 (44 Am. Dec. 593); *Boston* v. *Cummins,* 16 Geo. 102 (60 Am. Dec. 717).

We are of the opinion that if the Legislature had no power to appoint the commissioners, this alone would strike down the law. We quote from *Mayor, etc.,* v. *State,* 15 Md. 376 (74 Am. Dec. 572): "At the very threshold the relators are met with the objection that the law is radically void, because the Legislature had no power to appoint the commissioners in the act. It is plain that this point, if well taken, strikes down the law at one blow, because, if not validly appointed, they can not proceed to put it in force, and all other instrumentalities must fail."

We hold the law unconstitutional in all of its parts.

The judgment is reversed, with costs.

MITCHELL, J., dissents, for the reasons given in *State, ex rel.,* v. *Denny, ante,* pp. 382, 411.

Filed April 24, 1889.

### SEPARATE OPINION.

ELLIOTT, C. J.—I fully concur in the general conclusions announced in the principal opinion, but do not fully concur in all of the reasoning.

Filed April 24, 1889.