IN THE MATTER OF THE JOINT APPLICATION OF FORT WAYNE TRANSIT, INC., FORT WAYNE, INDIANA, SELLER, AND FORT WAYNE PUBLIC TRANSPORTATION CORPORATION, FORT WAYNE, INDIANA, FOR APPROVAL OF THE SALE AND TRANSFER OF CERTIFICATES NO. 3918-A 1, 3, 5, 6, AND 9, PASSENGERS, INTRASTATE *v.* INDIANA MOTOR BUS COMPANY, WESSON COMPANY (INDIANA RAILROAD DIVISION), GREYHOUND LINES, INC., AND A.B.C. COACH LINES, INC.

[No. 2-972A63. Filed October 29, 1973. Rehearing denied December 11, 1973. Transfer denied April 19, 1974.]

*David B. Keller*, of Fort Wayne, for appellant.

*Harry J. Harman, Kriner & Harman, Paul F. Brady, Brady & Brady*, of Muncie, *Thomas R. McCully, Roger D. Branigin, Jr., James V. McGlone, Stuart, Branigin, Ricks & Schilling*, of Lafayette, for appellees.

SHARP, J.—We must here interpret the Urban Mass Transportation Act of Indiana, hereinafter called UMT Act, IC 1971, 19-5-2-1 to 19-5-2-38, Ind. Ann. Stat. §§ 48-8801 (Burns 1972 Supp.), to determine whether the Public Service Commission, hereinafter called PSCI, has jurisdiction to approve the sale and transfer of Indiana Certificates of Public Convenience and Necessity to operate motor vehicles as a common carrier of persons intrastate.

At the very threshold of this case we are confronted with the question of whether the PSCI had any jurisdiction over

the Fort Wayne Transit, Inc., hereinafter referred to as Fort Wayne Transit, operating rights to the Fort Wayne PTC.

The sale was made pursuant to the UMT Act of 1965, IC 1971, 19-5-2-1—19-5-2-38, Ind. Ann. Stat. §§ 48-8801—48-8838 (Burns 1972 Supp.), hereinafter referred to as the UMT Act, which contains provisions for the benefit of urban mass transportation systems in financial difficulties. The system seeking such benefits must initiate action. It may do so in one of two ways. Its management may apply to the common council of a city within which it serves for assistance and, if said council finds that the financial position of the system is such that the "system is unable to render adequate service within the city or that there is imminent danger the system will be unable to render such service, the management of the system may apply to the common council of the city for assistance under the provisions of this act." IC 1971, 19-5-2-4, Ind. Ann. Stat. § 48-8804 (Burns 1972 Supp.). The council may make grants in aid to the system, it may purchase real or personal property from the system (at a price to be determined by appraisers) for lease to the system; it may purchase buses or real property from other services for lease to the system, or it may engage in a combination of such methods of assistance, IC 1971, 19-5-2-5—19-5-2-7, Ind. Ann. Stat. § 48-8805 (Burns 1972 Supp.).

If the management of the system believes that its situation is so precarious as to call for more desperate measures than public assistance—or, in the statutory language, "Whenever the management of an urban mass transportation system in any city shall be of the opinion that public acquisition of the system is necessary to enable the system to render adequate service within the city, the management of the system may request the common council to determine whether the public is to acquire the system." IC 1971, 19-5-2-8, Ind. Ann. Stat. § 48-8808 (Burns 1972 Supp.).

If the council shall so find, "it may adopt an ordinance

declaring that public acquisition of the system is in the public interest of the city, providing for the creation of a public transportation corporation, as hereinafter provided, specifying the number of directors of such corporation and setting forth the boundaries of such corporation . . ." IC 1971, 19-5-2-9, Ind. Ann. Stat. § 48-8809 (Burns 1972 Supp.).

The statute further requires that the council adopt such an ordinance within six months or the system may withdraw its request for public acquisition. IC 1971, 19-5-2-9, Ind. Ann. Stat. § 48-8809 (Burns 1972 Supp.). Once the request has been withdrawn, the system would be free to take the necessary steps to discontinue operation, leaving the public without service.

If the council does adopt such an ordinance, a board of directors is appointed for the public transportation corporation, IC 1971, 19-5-2-11, Ind. Ann. Stat. § 48-8811 (Burns 1972 Supp.). The board is required to begin the necessary steps leading to acquisition of the system:

> "The board of directors of the public transportation corporation and the management of the urban mass transportation system shall negotiate for the purchase of the property of the system by the public transportation corporation." IC 1971, 19-5-2-20, Ind. Ann. Stat. § 48-8820 (Burns 1972 Supp.).

If the negotiations are fruitless, the board is given the power to acquire the property by eminent domain. IC 1971, 19-5-2-20, Ind. Ann. Stat. § 48-8820 (Burns 1972 Supp.). Such power is to be exercised through the general statutes dealing with eminent domain. IC 1971, 32-11-1-1—32-11-1-13, Ind. Ann. Stat. §§ 3-1701—3-1712 (Burns 1968 Repl.). The eminent domain proceedings may not begin until the board

> ". . . has adopted an ordinance declaring that the public interest and necessity require the acquisition by the public transportation corporation of the property involved * * * and that such acquisition is necessary for the establishment, development, extension or improvement of the system." IC

1971, 19-5-2-22, Ind. Ann. Stat. § 48-8822 (Burns 1972 Supp.)

Further, the ordinance

". . . shall be conclusive evidence of the public necessity of such proposed acquisition and that such proposed acquisition is planned in a manner which will be most compatible with the greatest public good and the least private injury." ibid.

There is nothing in the statutory machinery dealing with the acquisition of a system by a public transportation corporation which makes it necessary for the PSCI to approve the transfer of the system's operating rights to the public transportation corporation. The decision to acquire, or otherwise assist, an ailing system is a legislative decision, placed by the Act in the hands of the common council. The process of negotiating the purchase price is placed in the hands of the board of directors of the public transportation corporation. Even the determination of necessity is to be made by that board rather than by a court in the event condemnation becomes necessary.

In the present case, the result of the PSCI order is that the Fort Wayne Public Transportation Corporation finds it bought the tangible property of Fort Wayne Transit, Inc., but not the operating rights. After spending over one-half million dollars, it finds itself in the position of holding property which it may or may not have the right to use and which would undoubtedly be of much greater value to the Fort Wayne Public Transportation Corporation if it could be used by that Corporation than if it had to be sold piecemeal on the open market.

Insofar as the purpose of UMT Act may have been to aid the owners of distressed transit systems, it has been fulfilled. Insofar as the purpose of the UMT Act was to assure the continuance of operations it has been thwarted. Further, the Fort Wayne Public Transportation Corporation has no recourse against its seller which has long since dissolved.

(The decision to dissolve Fort Wayne Transit, Inc. was made upon the independent advice of one of Indiana's most experienced utility lawyers with much expertise in PSCI practice.)

It may be said that the Fort Wayne Public Transportation Corporation could have protected itself by refusing to pay the money to the seller unless and until the PSCI had approved the transfer of the operating rights. However, such protection would not have been available if the Fort Wayne Public Transportation Corporation had proceeded by the exercise of eminent domain since the seller could have taken down its damages at any time, IC 1971, 32-11-1-8, Ind. Ann. Stat. § 3-1707 (Burns 1963 Repl.) and since any condemnation case could well have been concluded long before the PSCI had finally ruled on the transfer.

Thus, if a public transportation corporation insisted upon delaying the payment until the PSCI had approved the sale, the selling corporation could force the public transportation corporation to proceed through condemnation and so effectively deprive it of the right to condition payment upon PSCI approval of the transfer.

Further, the UMT Act permits a public transportation corporation to acquire a system and lease it:

"Upon acquisition of the necessary property by the public transportation corporation the board of directors of such corporation . . . in the discretion of the board . . . may lease the system to any operator or contract for the use of the system by any operator . . . Any contract or lease executed pursuant to this section shall be confirmed by ordinance of the board." IC 1971, 19-5-2-21, Ind. Ann. Stat. § 48-8821 (Burns 1972 Supp.).

Under the reasoning implicit in the PSCI's ruling in this case, any such lease or contract would have to be submitted for that agency's approval yet there is nothing in the UMT Act which shows that such a result was intended. Indeed, the UMT Act does not even mention the PSCI until after setting forth the provisions pertaining to the establishment of the

public transportation corporation, the selection and organization of their boards of directors and the acquisition of their properties.

Section 22 enumerates the powers of the boards of directors and among other things, this section provides:

"In Addition to the powers granted elsewhere in this act [§§ 48-8801—48-8838], the board of directors may acquire by grant, purchase, gift, demise, lease or otherwise and may hold, use, sell, lease or dispose of, real and personal property of every kind and nature whatsoever, licenses, patents, rights and interests necessary for the full exercise, or convenient or useful for the carrying on of any of its powers pursuant to the provisions of this act.

"The board shall have perpetual succession.

"The board may adopt a seal to be impressed upon its instruments and it may provide for the impression of such seal by printed or lithographic facsimile thereof. Any executed instrument bearing the seal of the board shall be prima facie evidence of its execution by the board and that its execution was duly, regularly and legally authorized by the board.

"The board may exercise the right of eminent domain for the condemnation of real or personal property, including any right or interest therein for its use within the boundaries of the public transportation corporation. Proceedings for the condemnation of property by the board shall be governed by the provisions of Acts 1905, chapter 48 [§§ 3-1701—3-1712], as amended, insofer as such provisions are not in conflict with this act. The board shall not institute any such proceedings until it has adopted an ordinance declaring the public interest and necessity require the acquisition by the public transportation corporation of the property involved, which property shall be generally described in the ordinance, and that such acquisition is necessary for the establishment, development, extension or improvement of the system. The ordinance of the board shall be conclusive evidence of the public necessity of such proposed acquisition and that such proposed acquisition is planned in a manner which will be most compatible with the greatest public good and the least private injury.

"The board shall have the power to contract with the United States of America, the state of Indiana, any political subdivision thereof, or with any department or agency

of such governmental entities, with any corporation, partnership, association or individual, upon such terms and conditions as the commission deems are for the best interests of the public transportation corporation.

"The board shall have the power to enter into agreements with any urban mass transportation system operating in territory contiguous to the boundaries of the public transportation corporation for the transfer of passengers between the system owned by the public transportation corporation and such system operating in territory contiguous to the boundaries of the public transportation corporation and to establish a special rate for such passengers.

"The board shall by ordinance make all rules and regulations governing the use, operation and maintenance of the urban mass transportation system. *It shall determine all rates, routings and hours and standards of service and change the same whenever it deems such change advisable, Provided, however, that in the exercise of such power the board shall be subject to the supervision and control of the public service commission of Indiana as hereinafter provided.*

"In the name of the public transportation corporation the board may sue or be sued in any court of competent jurisdiction. Service of process shall be made by service upon the secretary of the board, in any cause of action arising out of tort against said public transportation corporation suits must be instituted within two (2) years from the date of this said tort and no other notice of any kind or nature need be served upon said public transportation corporation.

"The board shall have the power to appoint or employ a general manager, accountants, attorneys, traffic engineers, drivers, clerks, secretaries, guards, laborers and such other employees as it may deem expedient, to prescribe and define their duties and regulate their compensation and to discharge them and appoint or employ their successors. All such personal employees shall be selected without regard to their race, religion or any personal affiliation. The board shall select the general manager on the basis of his fitness for the position, taking into account his executive ability and his knowledge of and experience in the field of mass public transportation. The board shall bargain collectively, and enter into written contracts, with duly authorized labor organizations representing employees other than executive, administrative or professional personnel. Such con-

tracts may provide for the binding arbitration of disputes so as to prevent work stoppages and fully effectuate the purposes of this act, and such contracts may provide for wages, salaries, hours, working conditions and benefits, including by way of illustration and not of limitation, provisions pertaining to health and welfare, insurance, vacations, holidays, sick leave, seniority, pensions and retirements.

"The board shall have the power to make or cause to be made, traffic surveys, population surveys and such other surveys and such other surveys and studies as it shall consider useful in the operation of the systems.

"The board shall have the power to carry out the purposes and objects of the public transportation corporation." IC 1971, 19-5-2-22; Ind. Ann. Stat. § 48-8822 (Burns 1972 Supp.) (our emphasis)

This is the only power whose exercise is conditioned upon the PSCI's approval. If the legislature had intended to limit the exercise of the other powers similarly, it would have said so. As was appropriately stated in *State ex rel. White* v. *Grant Superior Court* (1930), 202 Ind. 197, 209, 172 N.E. 897, 901:

"It is a rule of statutory and constitutional interpretation that, where a restriction is not general but is provided in a specific instance, such application of the specific instance will not be carried into other statements which do not provide such limitations. *City of Evansville* v. *State, ex rel.* (1899), 118 Ind. 426, 442, 21 N.E. 267, 4 L. R. A. 93; citing *Page* v. *Allen* (1868), 58 Pa. St. 338, 98 Am. Dec. 272; *Ex parte Vallandigham* (1864), 1 Wall. (U.S.) 243, 252, 17 L. Ed. 589.

It will have been noted that the critical statutory language insofar as the jurisdiction of the PSCI is concerned is:

"Any urban mass transportation *operating* under the provisions of this act shall be considered a common carrier not *operating* under a franchise or contract granted by a city or town and not regulated or controlled by ordinance and it shall be subject to the authority of the public service commission of Indiana . . ." IC 1971, 19-5-2-34, Ind. Ann. Stat. § 48-8834. (emphasis added)

The jurisdiction of the PSCI attaches to a system which is "operating," and "operating" imparts actual performance. The word "operate" means "to work, perform or function, as a machine does." Random House Dictionary of the English Language (1966). It is one thing to subject rates and charges to the jurisdiction of the PSCI, as is done generally with other municipally owned utilities. It is something else to give the appointed PSCI the power of veto over the determination of an elected common council that municipal acquisition should take place, particularly where the statutory sections dealing in detail with the acquisition confer no such jurisdiction.

The legislative purpose of the UMT Act of Indiana is clearly stated in Section 38 thereof:

> "This act being necessary for and intended to secure the public health, safety, convenience and welfare, and the protection of public and private property from the standpoint of both human and economic needs, the provisions of the act shall be liberally construed to effectuate the purposes thereof." IC 1971, 19-5-2-38, Ind. Ann. Stat. § 48-8838 (Burns 1972 Supp.).

There is clearly a strong home rule philosophy evident in this legislation to permit the local elected officials in urban areas the maximum opportunity and flexibility in solving mass transit problems. We do not find in it the intent to incorporate wholesale into it all of those provisions of the Motor Carrier Act in regard to the transfer of a certificate of public convenience and necessity in a transaction under it. In the UMT Act there is specific reference to the exercise of authority by the Public Service Commission which does not specifically include authority to approve the transfer involved here. Since that subject matter is specifically covered we may and should not read other provisions into the UMT Act by judicial fiat. We decline to do so.

Assuming arguendo, that the PSCI had jurisdiction here, it acted unreasonabbly and arbitrarily in denying the application

for the stated reason that the seller was no longer in existence. The wording of Finding No. 6 is as follows:

"That since Applicant Seller Fort Wayne Transit, Inc. no longer exists, there is lacking one of the two indispensable parties to a sale and transfer proceeding before the Commisison; therefore, the Protestants' verified joint Motion to Dismiss should be granted, and it will be so ordered."

The statute pertaining to transfers provides:

"Any certificate or permit or part thereof owned, held or obtained by any such carrier may be sold, assigned, leased, bequeathed or transferred as other property upon approval by the commission, and the commission may inquire into the responsibility of the person obtaining or seeking to obtain ownership or control of any certificate or permit or part thereof, his readiness, ability, and willingness to perform the service proposed, and whether the proposed service, to the extent authorized by the certificate or permit, is or will be consistent with the public interest and the state transportation policy declared in this act [§§ 47-1211—47-1250], and if it finds such person to be irresponsible or unable to render satisfactory and adequate service under said certificate or permit or part thereof, or if it finds that the transfer will not be consistent with the public interest and/or the state transportation policy as declared in this act, the commission may enter an order denying the transfer, in whole or in part: Provided, however, That no certificate or permit, or part thereof, may be sold, assigned, leased, bequeathed or transferred except after a public hearing before the commission and after notice as required for other hearings before the commission: Provided, further, That in the determination of such matters evidence shall be received as to any outstanding freight damage, loss or overcharge claims in order that the rights of the public may be fully protected. Provided, further, That nothing contained in the amendment of this section of the act shall be construed as affecting pending litigation or certificates or permits issued by the commission prior to the effective date hereof." IC 1971, 8-2-7-17, Ind. Ann. Stat. § 47-1219 (Burns 1965 Repl.)

It will be noted that the statute imposes no requirement that the seller remain in existence. It is concerned with

". . . outstanding freight damage, loss or overcharge claims in order that the rights of the public may be fully protected."

There was a great deal of testimony on these points, first by Elvira L. Loraine, the Assistant Secretary of Fort Wayne Transit, and then by Donald H. Walker, the President of that corporation. On direct examination Mr. Walker testified as follows:

"Q. Mr. Walker, at the time that this action was taken, and I refer you particularly to Article No. VIII, and I will ask you, was there consideration given to take care of any debts that might be in existence or claims of any type whatsoever against Fort Wayne Transit, Inc.

A. Yes.

Q. Mr. Walker, to the best of your information or belief was there any outstanding freight damage claims against Fort Wayne Transit, Inc.?

A. None.

Q. Was there any loss or overcharge claims that you know of in existence against Fort Wayne Transit, Inc.?

A. None whatsoever.

Q. Was there any effort made to see that the public rights would be fully protected as to any subsequent claims?

A. Under the liquidation act we held funds for two years and paid all claims and there were no further claims of record on July 16th 1971, at which time we distributed to the former shareholders of the company any money that was left."

Later the Attorney-Examiner examined Mr. Walker on this point in some detail:

"Q. You testified that there was provision in the Articles of Dissolution for payments of debts, and you had the funds for two years, and then you paid all claims of record on July 16, 1971, and then rebated approximately $20,000 to the shareholders of the Transit Company; is that correct?

A. To the former shareholders. There were no shareholders then.

Q. Now, at the time that you dissolved to the best of your knowledge that would be July 16, 1968?

A. '69.

Q. According to this resolution it said July 19, 1968, which is part of Applicant's Exhibit No. 1. What is your testimony as to the time of dissolution? What date?

A. July 17th, 1969. It was the 16th or 17th. It was filed with the Secretary of State's office on one day and in the courthouse the next day.

Q. Now at that time to the best of your knowledge were there any outstanding freight damage or overcharge claims pending against the Fort Wayne Transit, Inc.?

A. That would have been a little difficult, Mr. Examiner, because we never did any kind of business like that. No freight claims or anything of that sort. There might have tort claims.

Q. Well, all right. Were there any tort claims then?

A. Yes.

Q. Do you recall how many?

A. There was one lawsuit pending, and a few claims, perhaps half a dozen to my knowledge at the time.

Q. All right. Is it your testimony, then, that when the dissolution became final on July 16, or 17, 1971, that all these claims had been satisfied?

A. That is true.

Q. To your knowledge were there any other claims that arose subsequent to July 16 or 17, 1969, and prior to the dissolution date, two years later?

A. We were very careful on that, Mr. Examiner, to be sure that as of July 16, 1971, under the dissolution act, or section of the corporation act, that there was no suit brought or service of process had up to that time within the two years. That was the end of the two years.

Q. Do you have any knowledge of any that occurred subsequent to that time?

A. None."

This undisputed testimony makes it clear that the statutory purpose of protecting those with claims against the selling carrier had been fulfilled by the completion of the dissolution of Fort Wayne Transit.

There is nothing in our statute which would require the selling corporation to remain in existence until the PSCI has ruled. As Attorney General, Judge Emmert once rendered an opinion:

"As indicated in the case just above cited, the only issue which is presented to the Commission, and which is included in the publication of notice of hearing issued by the Commission, is whether the certificate should be transferred for an agreed price. Under the statute in the above case, as under the statute in our state, The commission has full power to determine the nature of the contract of sale, the character and responsibility of the purchase, its ability to give proper and adequate public service and any other feature materially affecting the sale of the certificate to the purchaser. The question of the abandonment by the seller or the quality of the service furnished by the seller is not germane, for otherwise, as pointed out by the Supreme Court of Ohio, the Commission in every case of sale and transfer would again have to go into the question of convenience and necessity which should have been disposed of when the certificate was originally granted.

\* \* \*

"Based upon the foregoing authorities it is therefore my opinion that on a petition for the sale and transfer of the right to transport property under a certificate of convenience and necessity, the Commission is not authorized to consider evidence on abandonment of service, but should consider such question only in connection with a petition to revoke or suspend the certificate for that reason." *Opinions of the Attorney General*, 1946, No. 90, pp. 354, 355.

Some years later, as a member of the Supreme Court, Judge Emmert stated that the following are the only ultimate facts necessary to be considered in passing on an application under Ind. Ann. Stat. § 47-1219 (1965 Repl.).

"The finding of the Commission in order to comply with § 54-112, Burns' 1951 Replacement, and § 47-1219, Burns' 1952 Replacement, should have contained findings of ultimate facts on the following points: (a) The substance of the Certificate of Convenience and Necessity held by Adkins, (b) the substance of the certificates of Convenience and Necessity held by B.B. & I. Motor Freight, Inc., (c) the substance of the contract constituting the lease between the parties, (d) the responsibility and the capacity of the lessee 'to render satisfactory and adequate service' under the leased certificate, (e) a finding as to any outstanding freight damage, loss or overcharge claims against both the lessee and the lessor." *Indianapolis & Southern Motor Express, Inc.* v.

*Public Service Commission of Indiana,* 232 Ind. 377, 112 N.E.2d 864, 867 (1953).

Such findings could be made here regardless of whether Fort Wayne Transit remained in existence.

Once the municipality has acquired a transit system, however, and began to operate it, then there is no reason why the PSCI should not exercise jurisdiction over the ▮ *operations* to the same extent it does over private carriers, subject to the restrictions set forth in Section 34, IC 1971, 19-5-2-34, Ind. Ann. Stat. § 48-8834 (Burns 1972 Supp.) and quoted above.

There are many decisions from the Indiana courts of review holding in conformity with the above. Recently, and succinctly, it was said:

> ". . . The Commission has no power except those conferred by statute." *Monon Railroad* v. *Citizens of Sherwood Forest* (1970), 146 Ind. App. 620, 624, 257 N.E.2d 846, 848.

A few years earlier our Supreme Court said:

> "It is a general rule that any administrative tribunal is governed by the powers, both express and implied, which are granted by the Legislature in the enactment of the statute creating it." *Board of Trustees of Police Pension Fund* v. *State ex rel. Russell* (1966), 247 Ind. 570, 576, 219 N.E.2d 886, 890.

*Boone County R. E. Mem. Corp.* v. *Public Service Com'n* (1958), 129 Ind. App. 175, 186, 187, 155 N.E.2d 149, is an earlier example of the cases stating this principle:

> "It is a fundamental principle of law that every administrative agency of the state of Indiana must find the source of its authority in the statute conferring it, and it can only exercise the power conferred in conformity with the statute. See *State Board of Tax Com'rs* v. *McDaniel* (1928), 199 Ind. 708, 160 N.E. 347; State ex rel. Licking Tp. v. Clamme (1922), (T.D. 1923) 80 Ind. App. 147, 134 N.E. 676.
>
> "Both the Supreme Court and our court have held that the Commission derives its authority from the statutes and possesses only such power as is conferred by statutes."

The overall question of public convenience and necessity was resolved long before the Fort Wayne PTC entered the picture. At that stage, it was for management of Fort Wayne Transit, Inc. to determine whether public acquisition was necessary to assure "adequate service," IC 1971, 19-5-2-8, Ind. Ann. Stat. § 48-8808 (Burns 1972 Supp.) and it was for the elected common council to determine whether it was in the "public interest" that such an acquisition take place. IC 1971, 19-5-2-9, Ind, Ann. Stat. § 48-8809 (Burns 1972 Supp.).

There is nothing in the UMT Act to suggest that the PSCI was to review those determinations and there is nothing in the Motor Carrier Act of 1935 to suggest that the PSCI's special expertise extends to the political and economic factors which enter into a common council's determination of what is in the "public interest" of the city it represents.

To the extent the two statutes may conflict, there is no question but that the UMT Act of 1965—dealing as it does with the specific control, must prevail over the general terms of the Motor Carrier Act of 1935 in view of ". . . the well-settled rule of statutory construction that where general and specific statutes conflict in their application to a particular subject matter, it will be deemed to have been the legislative intent that the specific provisions rather than the general provisions control." *Grether* v. *Indiana State Board of Dental Examiners* (1959), 239 Ind. 619, 159 N.E.2d 131.

The Public Service Commission acted beyond its jurisdiction. It also acted arbitrarily and unreasonably in premising its denial of this application on the continued non-existence of the seller. Since this essence of our decision is the lack of jurisdiction, the decision here is reversed with instructions to dismiss this application.

Hoffman, C.J. and Staton, J., concur.

NOTE.—Reported at 302 N.E.2d 786.

## ON APPELLEES' PETITION FOR REHEARING

PER CURIAM.—The appellees have filed their Petition For Rehearing, alleging that the Court erred in its opinion and decision in certain respects, and further asserting that the directive contained in our opinion is unclear. Upon review of the opinion, we find that it should be clarified. We now correct the same by deleting the final paragraph thereof and substituting in its stead the following:

"The Public Service Commission acted beyond its jurisdiction. It also acted arbitrarily and unreasonably in premising its dismissal of this application on the basis of continued non-existence of the seller. Since the essence of our decision is lack of jurisdiction, this cause is remanded to the Public Service Commission with instructions to correct its order dismissing the application for lack of an indispensable party, to dismissal on the ground it lacks jurisdiction of the application."

With this correction, we re-affirm our original opinion in all other respects. The appellees' Petition For Rehearing is denied.

NOTE.—Reported at 304 N.E.2d 336.