Pedro Parrilla Montañez, etc., Plaintiff and Appellee, *v.* Herbert A. Martin, Acting Commissioner of Education of Puerto Rico, Substituted by Mariano Villaronga, Commissioner of Education, Defendant and Appellant.

No. 9580. Argued: December 8, 1947.—Decided January 28, 1948.

---

Luis Negrón Fernández, Attorney General, Carlos Santana Becerra and A. Torres Braschi, Assistant Prosecuting Attorneys, for appellant. R. Arjona Siaca for appellee. Guillermo Cintrón Ayuso, counsel for the American Union of Civil Liberties, as amicus curiae.

OPINION OF MR. JUSTICE DE JESÚS in which MR. CHIEF JUSTICE TRAVIESO concurs.

In the Regular Session of 1946 the Legislature of Puerto Rico approved, over the veto of the Governor, Senate Bill No. 51, which provides that instruction in our public schools shall be conducted exclusively in the Spanish language. The Governor again vetoed the bill and sent it by mail on April 30, 1946 to the Director of the Division of Territories and Island Possessions with the request that the latter transmit it to the President. On May 6 the Director of the Division of Territories and Island Possessions received the bill; but for reasons not disclosed by the record, he did not send it to the White House until August 6, on which date it was received by an employee of the Office of the President.

On August 13, 1946 the appellee filed this proceeding in the lower court for a declaratory judgment. Among other things, he alleged that more than 90 days had elapsed since the Governor transmitted the bill to the Division of Territories and Island Possessions, and that since the President had not returned it, it had become law. He prayed for a declaratory judgment that the bill had become law and that the defendant must put it into effect.

The defendant answered. Before trial he filed a supplemental answer in which he alleged that on October 25, 1946 the President had disapproved the bill. Notwithstanding this disapproval, the court *a quo* rendered judgment on February 25, 1946, declaring that the bill had been law since August 4, 1946 and that it must be put into effect by the defendant.

In the opinion of the lower court, the bill must be considered as having been received by the President on the date it was received by the Division of Territories and Island Possessions. Consequently, according to the district court, the period of time fixed by § 34 of the Organic Act within which the President must approve or disapprove a bill began to run on May 6, 1946. The pertinent portion of the said Section reads as follows:

" . . . If when a bill that has been passed is presented to the governor for his signature he approves the same, he shall sign it; or if not, he shall return it, with his objections, to the house in which it originated, which house shall enter his objections at large on its journal and proceed to reconsider it. If, after such reconsideration, two-thirds of all the members of that house shall agree to pass the same it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of all the members of that house it shall be sent to the governor, who, in case he shall then not approve, *shall transmit the same to the President of the United States* . . . If the President of the United States approve the same he shall sign it and it shall become a law. If he shall not approve same he shall return it to the governor so stating, and it shall not become a law except the President of the United States shall approve or disapprove an act *submitted to him* under the provision of this section within ninety days from and after its submission for his approval; and if not approved within such time it shall become a law the same as if it had been specifically approved . . . " (Italics ours.) [48 U.S.C.A. sec. 825; 39 Stat. 960 (1917).]

It is important to note that the aforesaid § 34 imposes two different duties on the Governor and the President, respectively. It directs the former *to transmit* the bill to the Presi-

dent.[1]  Once he has transmitted the bill, the Governor has complied with his duty.  The Section vests the President with the power to approve or disapprove the bill within ninety days of its submission to him.  Once the bill is submitted to the President, the ninety-day period the statute gives him to consider the bill begins to run.  The statute does not say that the said period begins to run from the date the Governor transmits the bill.  On the contrary, it expressly provides that it begins to run from the time *it is submitted* to the President for his approval.

The letter of the law is clear.  The lower court did not reject this interpretation, but was of the view that the Division of Territories and Island Possessions is an agent of the President and therefore that the receipt of the bill by the Division was tantamount to delivery of the bill to the President.  The lower court sought support for this theory in § 11 of the Organic Act,[2] the Act of Congress of March 3,

---

[1] In his letter of April 30, 1946, addressed to the Director of the Division of Territories and Island Possessions, Governor Tugwell stated:

"Dear Mr. Arnold:  I am sending you herewith a letter to the President of the United States with the attachment recommending that he uphold my veto to Senate Bill No. 51 approved by the Legislature of Puerto Rico in its last session.  The letter and accompanying documents are self-explanatory.  *I will greatly appreciate your forwarding these through the proper channels for presentation to the President for his action.*"  (Italics ours.)

[2] Section 11 of the Organic Act provides:

"All reports required by law to be made by the governor or heads of departments to any official of the United States shall be made to an executive department of the Government of United States to be designated by the President, and the President is authorized to place all matters pertaining to the Government of Porto Rico in the jurisdiction of such departments."  [48 U.S.C.A. sec. 794, 39 Stat. 955 (1917) ]

Section 11 of the Organic Act now in force was taken from Section 2 of the Act of Congress of July 15, 1909 (36 Stat. 11 (1909) ), to amend the former Organic Act known as the Foraker Act, which was in force until March 1, 1917.  Section 2 of the Act of July 15, 1909 provides:

"That all reports required by law to be made by the Governor or members of the executive council of Porto Rico to any official in the United States shall hereafter be made to an executive department of the Government of the United States to be designated by the President; and the President is hereby authorized to place all matters pertaining to the government of Porto Rico in the jurisdiction of such department."

1933 [3] and the Executive Order of May 29, 1934,[4] promulgated by President Roosevelt.

## I

The determination of whether the theory of the court *a quo* is correct requires examination of the said Acts and Executive Order.[5]

---

Under the authority conferred on him by said § 2 of the Act of Congress of July 15, 1909, President Taft, on the same day that he approved the said Act, issued an Executive Order, which in its pertinent part reads as follows:

". . . all reports required by law to be made by the Governor or members of the executive council of Porto Rico to any official in the United States will be made to the War Department, and all matters pertaining to the government of Porto Rico are placed in the jurisdiction of that department. The business of the department pertaining to civil government in Porto Rico is, pursuant to Section 87 of the Act of July 1, 1902, assigned to the Bureau of Insular Affairs. WM H Taft—The White House—July 15, 1909."

[3] The pertinent provision of this Act reads:

"Whenever the President, after investigation, shall find and declare that any regrouping, consolidation, transfer, or abolition of any executive agency or agencies and/or the functions thereof is necessary to accomplish any of the purposes set forth in section 401 of this title, he may by Executive order:

"(a) Transfer the whole or any part of any executive agency and/or the functions thereof to the jurisdiction and control of any other executive agency;

"(b) Consolidate the functions vested in any executive agency; or

"(c) Abolish the whole or any part of any executive agency and/or the functions thereof; and

"(d) Designate and fix the name and functions of any consolidated activity or executive agency and the title, powers, and duties of its executive head; except that the President shall not have authority under this title to abolish or transfer an executive department and/or all the functions thereof." 47 Stat. 1518 (1933).

[4] The Executive Order of President Roosevelt dated May 29, 1934, so far as pertinent, provides:

". . . Whereas, after investigation I find and declare that the establishment of a Division of Territories and Island Possessions in the Department of the Interior and the transfer thereto of the functions of the Bureau of Insular Affairs, War Department, pertaining to the administration of the government of Puerto Rico is necessary to effectuate the purpose of the said section 16; Now, Therefore, by virtue of and pursuant to the authority in me vested by the aforesaid section 16 of the Act of March 3rd, 1933, it is ordered that a Division which shall be known as the Division of Territories and Island Possessions be, and it is hereby established in the Department of the Interior; and it is further ordered that all of the functions of the Bureau of Insular Affairs, Department of War, together with its personnel, records. . .pertaining to or connected with the administration of the government of Puerto Rico, be, and they are hereby, transferred from the Department of War to the Division of Territories and Island Pos-

Section 11 of the Organic Act provides that all the reports required by law to be made by the Governor or the heads of department "to any official of the United States", shall be made to an Executive Department of the Government of the United States to be designated by the President. In addition, it authorizes the latter to place all matters pertaining to the Government of Puerto Rico in the jurisdiction of such Department.

The Act of Congress of March 3, 1933 (47 Stat. 1517 (1933)) provides that the President shall investigate and determine whatever reorganization is necessary within the executive branch of the government and it authorizes him to make such reorganization.

Finally, the Executive Order of March 29, 1934 created the Division of Territories and Island Possessions attached to the Department of the Interior. It provided that all the functions of the Bureau of Insular Affairs, War Department,[6] together with its personnel, records, etc., pertaining to or connected with the administration of the Government of Puerto Rico were transferred from the Department of War to the Division of Territories and Island Possessions, Department of the Interior, to be administered under the supervision of the Secretary of the Interior.

We find nothing in said Acts or in the Executive Order from which it may rationally be inferred that the Division of Territories and Island Possessions is an agent of the President. The provision that all reports required by law to be

sessions, Department of the Interior, to be administered under the supervision of the Secretary of the Interior. . ."

[5] We state in fairness to counsel for the defendant that both in their brief and oral argument, they do not concede that the transmittal of a bill to the President constitutes the report mentioned in § 11 of the Organic Act. However for the purposes of this opinion, we shall assume that § 11 is applicable. As a matter of fact, Governor Tugwell transmitted the bill with an accompanying report to the President, setting forth his reasons for vetoing the bill and recommending that the President disapprove the bill. See footnote 1.

[6] See end of footnote 2.

made by the Governor or heads of department "to any official of the United States" shall hereafter be made to the Division of Territories and Island Possessions, does not make this Division an agent of the President of the United States in connection with such an important power as the veto power, which is granted by law to the President personally. As stated in the concurring opinion of Mr. Justice Stone, with which Mr. Justice Brandeis concurred, in *Wright* v. *United States,* 302 U. S. 583 (footnote 4, page 601), the important power to receive a bill in the name of the President is not conferred *sub silentio.*

The significance of the veto power is set forth in simple but felicitous language in the *Pocket Veto Case,* 279 U. S. 655, 677–8:

"The Constitution in giving the President a qualified negative over legislation—commonly called a veto—entrusts him with an authority and imposes upon him an obligation that are of the highest importance, in the execution of which it is made his duty not only to sign bills that he approves in order that they may become law, but to return bills that he disapproves, with his objections, in order that they may be reconsidered by Congress. The faithful and effective exercise of this momentous duty necessarily requires time in which the President may carefully examine and consider a bill and determine, after due deliberation, whether he should approve or disapprove it, and if he disapproves it, formulate his objections for the consideration of Congress. To that end a specified time is given, after the bill has been presented to him, in which he may examine its provisions and either approve it or return it, not approved, for reconsideration. (Citations) The power thus conferred upon the President cannot be narrowed or cut down by Congress, nor the time within which it is to be exercised lessened, directly or indirectly. And it is just as essential a part of the constitutional provisions, guarding against ill-considered and unwise legislation, that the President, on his part, should have the full time allowed him for determining whether he should approve or disapprove a bill, and if disapproved, for adequately formulating the objections that should be considered by Congress, as it is that Congress, on its part, should have an opportunity to re-pass the bill over his objections."

If we stop to consider for a moment that § 34, in requiring that the bill *be submitted* to the President, has as its purpose that the latter, and only he shall approve or disapprove it, we are unable to give to § 11 and to the Executive Order of May 29, 1934 the interpretation given to it by the lower court, which reaches the paradoxical result, as we have noted, of concluding that a bill, which was sent for the first time to the White House on August 6, 1946, had already become law on August 4, 1946. That is to say, two days before the President had an opportunity to approve or disapprove the bill, it had already become law in the judgment of the lower court, merely because the Division of Territories and Island Possessions withheld it without submitting it to the President. In other words, the important power to approve or disapprove a bill, vested in the President by § 34 of the Organic Act, was never exercised by the President because the Division of Territories and Island Possessions failed to submit it to him. A case like this may happen but this is an extraordinary situation which would have never developed if the Division of Territories and Island Possessions had submitted the bill more promptly to the President, or if a term were fixed by law within which a bill must be submitted to the President for his approval. In view of the position in which the Division of Territories and Island Possessions has placed us whereby we must find either that the President is precluded from complying with the duty imposed on him by § 34 of the Organic Act, or that approval or disapproval by the President of a bill passed by the Legislature of Puerto Rico over the veto of the Governor must remain pending for a period longer than necessary because it was not submitted promptly to the President, we must choose the interpretation which gives effect to § 34 of the Organic Act.

In our opinion, the purpose of § 11 of the Organic Act, insofar as the transmittal of reports is concerned, is to indicate the official channels through which they must be

sent. And in the instant case we have already pointed out that the Governor complied with his duty of transmitting the bill through the proper channels. Whether the Division of Territories and Island Possessions complied with its duty with due diligence is a question which has no bearing on the present case; and that fact does not convert the bill into law against the will of the President, which he expressed within the ninety-day period after it was actually submitted to him.

## II

■■ The lower court also rested its theory on the fact that a Professor of the University of Kent and plaintiff's attorney wrote several letters to the President in connection with the bill and although they did not receive any answer from the White House, they were informed by the Department of the Interior that said letters had been referred to it. This circumstance is taken by the lower court and by the appellee as an indication that the President considered the bill submitted to him and that he had sent it to the Department of the Interior for its study and advice. On this assumption they concluded that the time the bill was kept in the Department of the Interior must be counted as if it had been under consideration by the President. They cite *State* v. *Grant Superior Court,* 172 N. E. 897 (1930).

If the letters acknowledging receipt had come from a Department other than the Interior, there might be some ground for the assumption that when the letters were referred to said Department by the White House, this indicated that the President had sent the bill to that Department for study and advice. We must presume that the Office of the President was aware that if the bill had been transmitted by the Governor, and it had not yet reached the President, it must still be in the Office of the Division of Territories and Island Possessions, which was the proper channel for transmittal under the Executive Order of May 29, 1934. It seems logical under

these circumstances that all the correspondence should be sent to the Division of Territories and Island Possessions to be considered by the President together with the bill when it was submitted for his approval. The letters were connected with the bill and it was only natural that they were all kept together.

The case of *State* v. *Grant Superior Court, supra,* is inapposite. In this case the Governor had designated one of the clerks of his office to receive the bills presented by the Legislature for his consideration. The Governor gave instructions to the effect that all bills which reached his office after midnight on March 8 should be delivered immediately to the Attorney General for his study and advice. When the messenger of the Legislature arrived at the Office of the Governor with the bill in question, the receiving clerk of the Governor, pursuant to the directions of the Governor, told the messenger of the Legislature to deliver it to the Attorney General, which he did. The question then arose whether the time that the Attorney General kept the bill should be counted as part of the time allotted to the Governor for its consideration. In the light of these facts, the Supreme Court of Indiana held that the time during which the bill was in the hands of the Attorney General, under the direction of the Governor himself, must be regarded as if it had been under consideration by the Governor.

It seems clear that if in the case at bar the bill had been submitted to the President and the latter had referred it to the Department of the Interior for study and advice, the case of *State* v. *Grant Superior Court, supra,* would be applicable and since its ruling is correct we would have followed it in the present case. But the facts here do not warrant that conclusion.

Other cases cited by the lower court and by the appellee are not applicable and do not justify our taking time to distinguish them.

The judgment is reversed and another will be entered declaring that Senate Bill No. 51 never became law because it was disapproved by the President of the United States within the ninety-day period counted from the day it was submitted to him for his consideration.

Mr. Justice Marrero did not participate herein.

Separate opinion of MR. JUSTICE SNYDER.

Although I am in substantial agreement with a considerable portion of the opinion of Mr. Justice De Jesús, I believe the judgment of this Court should be grounded primarily on an explicit ruling that § 11 of the Organic Act has no bearing on this case and that § 34 alone is controlling.

In the first place, § 11 on its face is inapplicable. It refers solely to reports made by the Governor to an executive department of the United States to be designated by the President. There is nothing in § 11 concerning transmittal of bills by the Governor to the President. That question is covered exclusively by § 34 of the Organic Act.

Secondly, the legislative history of §§ 11 and 34 reinforces this interpretation. Section 11, providing for reports by the Governor, did not appear in its present form in the Foraker

Act of 1900. 31 Stat. 77. It was originally enacted in 1909 as an amendment to the Foraker Act, 36 Stat. 11; and it was reenacted without substantial change in the Jones Act of 1917. 39 Stat. 951. On the other hand, the provision for Presidential veto found in § 34 made its first appearance in the Jones Act. The point is obvious. If by § 34 the veto power was vested in the President for the first time in the Jones Act, Congress could not have intended to prescribe the procedure for transmission of bills by the Governor to the President in § 11, which was enacted eight years prior to passage of § 34. Section 11 sheds no light on our problem; the issue rises or falls on the meaning of § 34.

Once we conclude that § 34 governs here, this case becomes simple. Unlike § 11, there is nothing in § 34 concerning transmittal of bills by the Governor to an executive department of the United States which serves as agent of the President to receive them. On the contrary, § 34 provides that the Governor shall transmit the bills to the President. Assuming that the President may nevertheless delegate authority to an agent to receive the bills for him, he has not done so. Consequently, the Department of Interior was the agent of the Governor for transmittal of the bill to the President, and not the agent of the President to receive it. The ninety-day period within which the President must approve or disapprove a bill therefore did not begin to run when the Department received the bill from the Governor, with a request from the Governor to transmit it to the President. Rather it ran from the date the President received the bill from the Department, which served as the agent of the Governor for transmittal to the President. As the President vetoed the bill before the ninety-day period as thus calculated expired, the bill did not become law.

What makes this case troublesome is the fact that the Department of Interior as agent of the Governor did not transmit the bill to the President until three months after

its receipt by the Department from the Governor. Its Solicitor wrote in an opinion that "This Department was less than prompt in transmitting the bill to the President." In the light of the facts, that statement deserves inclusion in the Department of Understatement of "The New Yorker".

The President has ninety days in which to approve or disapprove a bill. Under existing law and practice one of the functions of the Department of Interior is to study bills and advise the President thereon. But the spirit of § 34 contemplates that the study will be made by the Department while the ninety days are running.

The Department, as agent of the Governor, should have transmitted the bill to the President forthwith. After receipt, the President would undoubtedly have referred the bill to the Department for its opinion as his agent. And while the study was being made, the ninety-day period would have been running. Instead, the Department as agent of the Governor, chose to withhold the bill from the President for three months. It was indeed "less than prompt" in taking three months for the bare act of transmittal to the President. During that period it prematurely performed its wholly different role of agent of the President for study and advice. By telescoping its respective duties to the Governor and the President, the Department frustrated the intent of Congress that the ninety-day period within which the President must act shall run while the Department he selects as his agent studies the bill and gives him its views.

The Department of Interior was able to violate the spirit of § 34 because that Section, unfortunately, does not require the Governor to transmit a bill to the President within a fixed period. If such a provision existed, the Department could no longer as agent of the Governor delay at its pleasure submission of a bill to the President. Perhaps Congress will desire to fill this gap in the statute.

Mr. Justice Todd, Jr., dissenting.

I dissent. I believe § 11 of the Organic Act is applicable to this case. Even assuming that technically it is not, the administrative practice established and approved by the President, which was proved as a fact, has been that all official communications from officers of the Government of Puerto Rico, including the Governor, to any official of the United States, including the President, have been transmitted to the Executive Department of the Government of the United States designated by the President—which prior to 1934 was the War Department (Bureau of Insular Affairs) and thereafter, was the Department of the Interior (Division of Territories and Island Possessions), pursuant to the Executive Orders of July 15, 1909 and May 29, 1934. In addition, it was also proved as a fact that all bills vetoed by the Governor on previous occasions have been transmitted with accompanying reports to the said Executive Department.

By designating the Division of Territories and Island Possessions of the Department of the Interior to receive all the reports which were required by law to be made by the Governor of Puerto Rico to the President, the latter made the said Department his agent. That this was the understanding of the White House is evident from the answers by the Department of the Interior to the letters written to the President by appellee's attorney and by a professor in the University of Kent. These answers informed them that the said letters had been referred to the said Department. If, as stated in the opinion of Mr. Justice De Jesús, ''We must presume that the President's office was aware that if the bill had been transmitted by the Governor, and it had not yet reached the President, *it must still be in the office of the Division of Territories and Island Possessions, which was the proper channel for transmittal under the Executive Order of May 29, 1934,*'' the office of the President was aware of this and it referred the letters to the said Division because

it considered that the Executive Order was applicable, in connection with § 34 of the Organic Act, to the report rendered by the Governor on the vetoed bill. Furthermore, Exhibits 8 and 12 of the plaintiff, consisting of two letters from Mr. Chapman, Acting Secretary of the Interior, addressed to Senator Arjona Siaca, dated October 28, 1946 and November 25, 1946, show beyond doubt that the said administrative practice existed and had the whole-hearted official approval of the said Department.[1]

We must be realistic in considering the scope of § 34 of the Organic Act as to the point in controversy here. As a matter of fact and in view of the established administrative practice, it ought not be contended that the transmittal by the Governor to the President of a bill vetoed by the former, is not the transmittal of one of the reports contemplated by § 11 of the Organic Act. It is conceded that the vetoed bill was accompanied by a report of the Governor setting forth the grounds for his action. It would be illogical to argue that the said report should have been sent to the Department of the Interior and that the bill should have been sent directly to the President. Both documents were sent to the executive department designated by the President

---

[1] We quote from the first of these letters: ''As your letter correctly states, the practice has been for communications addressed by the Governor of Puerto Rico to the heads of executive departments of the Government or to the President to be sent to this Department for transmittal. A similar procedure is followed in the other territories and possessions. *It has also been the practice,* because of this Department's responsibilities in connection with the administration of the Government of Puerto Rico and *in accordance with what you characterize,* in another connection, as *'the President's deliberate but implicit approval', for this Department to accompany the transmittal to the President of legislation repassed by the territorial legislatures over the veto of the Governor* with a recommendation as to action to be taken by the President under the provisions of the Organic Act.'' (Italics ours.)

We quote from the second letter as follows: ''The practice of transmitting legislation repassed by a territorial legislature over a governor's veto to the President with a departmental recommendation of approval or disapproval has not been reduced to a formal rule or regulation of the Department. *It is entirely a matter of custom.* The procedure outlined in my previous letter *has been followed in the past.*'' (Italics ours.)

to receive any report from local officials and, by administrative practice, this delegation of authority was extended to receive vetoed bills together with any report which might accompany them. The President himself, authorized by law, designated the Department of the Interior as his agent. The receipt of the bill by the Department as such agent was therefore equivalent to receipt by the President himself.

In *Wright* v. *United States,* 302 U. S. 583, 590, the court held that the Secretary of the United States Senate could receive a bill vetoed by the President while the Senate was in recess. The Court said:

"There is no greater difficulty in returning a bill to one of the two Houses when it is in recess during the session of Congress than in *presenting* a bill to the President by sending it to the White House in his temporary absence. Such a presentation is familiar practice. The bill is sent by a messenger and is received by the President. It is returned by a messenger, and why may it not be received by the accredited agent of the legislative body? To say that the President can not return a bill when the House in which it originated is in recess during the session of Congress, and thus afford an opportunity for the passing of the bill over the President's objections, is to ignore the plainest practical considerations and by implying a requirement of an artificial formality to erect a barrier to the exercise of a constitutional right." (Italics ours.)

And the court so held in a case where there was no statute or regulation whatsoever authorizing the Secretary of the Senate to receive a bill during a recess of that legislative body.

I believe that *State* v. *Grant Superior Court,* 172 N.E. 897 (1930) is applicable to the facts of this case. There the Governor delegated to the Attorney General the authority to receive and to make his recommendations on the bill. It was held that the time during which the Attorney General retained the bill in his possession must be counted as part of the time allowed the Governor to consider it. In the instant case, the President, either by statute and executive order, or by an administrative practice approved by him by which

the said Act and executive order were applied, delegated to the Division of Territories and Island Possessions the authority to receive, on his behalf, the bill. In my opinion, the time during which the said Division withheld the bill must therefore be computed in the same manner.

Moreover, the only duty imposed on the Governor by § 34 of the Organic Act is to transmit the vetoed bill to the President; and pursuant to § 11 of the same Act and the Executive Order of 1934, the Governor is also required to send any report which he has to make to the President through the Division of Territories and Island Possessions of the Department of the Interior and therefore the said Executive Order places in the said Division all the affairs pertaining to the Government of Puerto Rico. Section 34 of the Organic Act, in providing that the President shall approve or disapprove a bill submitted to him expressly, states "under the provisions of this Section", that is, when it has been transmitted by the Governor, and if said transmittal by law, by Executive Order, or by administrative practice, had to be made through the Division of Territories and Island Possessions, the bill was submitted to the President on the day it was received by the said Division, that is, on May 6, 1946. If the said Federal Division, because it was studying the bill, or through negligence, oversight or for any other reason, failed to submit it to the President in time to enable him to decide whether he approved or disapproved it, prior to the expiration of the ninety days fixed by the Organic Act, that fact is not a reason why we should construe the statute and decide the legal question raised in such a manner as to make the Division of Territories and Island Possessions the absolute arbiter of the date on which it should be considered that the bill vetoed by the Governor was submitted to the President. Such a construction would lead us to the absurd position of holding that there is no fixed period within which the Division of Territories and Island Possessions must sub-

mit such an important matter to the President, for his consideration, despite the fact, first, that the Organic Act itself limits the term the President has to act to ninety days, and second, that the said Division is beyond the control of the Government of Puerto Rico and on the contrary acts by express delegation of the President, and as a matter of fact the established administrative practice had the deliberate although implied approval of the President.

That the administrative practice in cases of this nature deserves serious consideration has been expressly held by the Supreme Court of the United States in the "Pocket Veto Case" of *Okanogan Indians* v. *United States,* 279 U. S. 655, where it said:

"The views which we have expressed as to the construction and effect of the constitutional provision here in question are confirmed by the practical construction that has been given to it by the Presidents through a long course of years, in which Congress has acquiesced. *Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character.* Compare *Missouri Pac. Ry. Co.* v. *Kansas, supra,* 284; *Myers* v. *United States,* 272 U. S. 52, 119, 136; and *State* v. *South Norwalk,* 77 Conn. 257, 264, in which the court said that a practice of at least twenty years duration 'on the part of the executive department, acquiesced in by the legislative department, while not absolutely binding on the judicial department, is entitled to great regard in determining the true construction of a constitutional provision the phraseology of which is in any respect of doubtful meaning.' " (Italics ours.)

In the case at bar it was proved that the only established practice was that the Governors of Puerto Rico always sent all the vetoed bills through the Division of Territories and Island Possessions for the consideration of the President and that the President acquiesced in this practice. How can this administrative practice be denied legal force in the present case?

But, as I said at the beginning of this opinion, I believe that § 11 of the Organic Act is applicable. I have

already expressed some of the grounds. In addition, this statutory provision not only deals with the procedure for sending reports from insular to Federal officials, but it also authorizes the President "to place all matters pertaining to the Government of Porto Rico in the jurisdiction of such department." Both the question of procedure mentioned in the first part of § 11 with respect to reports, and the matters pertaining to the Government of Puerto Rico have by Executive Order of the President been placed under the jurisdiction of the Division of Territories and Island Possessions of the Department of Interior. Since this Division constituted at least his "accredited agent", as was said in the *Wright* case, *supra,* we should not decide that the time utilized by the agent to consider the bill should not be counted as time used by the principal.

Unless we found that the Department of the Interior through its Division of Territories and Island Possessions was authorized under § 11 of the Organic Act and by the Executive Order of 1934 to receive, in the name of the President, the bill sent by the Governor of Puerto Rico, we would be required to conclude that its action in withholding Senate Bill No. 51 for more than ninety days was illegal and that it acted in a most reprehensible manner in not transmitting the bill to the President as soon as it received the bill. We should not construe the Organic Act and the Executive Order in a manner that forces us to arrive at such a conclusion.

As to the legislative history of §§ 11 and 34 of the Organic Act to which Mr. Justice Snyder refers in his opinion, I believe that, although the two premises on which he bases his conclusion are correct, the conclusion itself is erroneous. It is true that § 11 is substantially a copy of the 1909 amendment to the Foraker Act and that § 34 for the first time vested the veto power in the President. Nevertheless, these two facts do not mean that after approval of § 34, and precisely because of the fundamental reason

that the said Section does not establish the procedure for transmittal of bills from the Governor to the President, there ought not be applied § 11, supplemented by the Executive Order of 1934, which does establish the said procedure or, assuming it does not, has been followed as a matter of administrative practice, not only in connection with reports of an administrative character, but also without exception, in the transmittal of all kinds of communications between the Governor and the President including, of course, the transmittal of bills vetoed by the Governor.

It is my view that § 11, together with the construction which the Governor as well as the Department of the Interior and the President have given it by administrative practice, is the Section which sheds light on the problem before us, in view of the silence of § 34 as to the official and adequate procedure for transmittal of bills by the Governor to the President.

In my opinion, the judgment should be affirmed.